IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

KIMBERLY A. CARTER                                                                   PLAINTIFF


V.                              Civil No. 2:17-cv-02107-PKH-MEF


NANCY A. BERRYHILL, Commissioner
Social Security Administration                                                       DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Kimberly Carter, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

**I.     Procedural Background**

Plaintiff filed her applications for DIB and SSI on February 27, 2014, alleging an onset date of February 18, 2014, due to epilepsy, osteoarthritis of the knees, and restrictive lung disease.  (ECF No. 9, pp. 88, 245-259, 326-327, 358-359).  On May 20, 2015, ALJ Shilling held an administrative hearing.  (ECF No. 9, p. 14).  Subsequently, the case was reassigned to ALJ Starr, who held a supplemental hearing on June 20, 2016.  (ECF No. 9, p. 14).  Plaintiff was present and represented by counsel at both hearings.

On August 12, 2016, the ALJ concluded that the Plaintiff's epilepsy, other nervous system disorder, obesity, restrictive lung disease, and degenerative joint disease of both knees were severe, but concluded they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (ECF No. 9, pp. 16-17). He then found Plaintiff capable of performing light work involving no work near hazards or moving machinery, operation of moving vehicles, climbing of ropes/ladders/scaffolds, or crouching; occasional climbing of ramps and stairs, balancing, crawling, kneeling, stooping, and crouching; and, frequent fingering and handling bilaterally. (ECF No. 9, pp. 17-19). The ALJ also concluded Plaintiff should avoid concentrated exposure to pulmonary irritants such as dust, odors, and gases. With the assistance of a vocational expert, the ALJ found the Plaintiff capable of returning to her PRW as a cashier and medical receptionist/records clerk. (ECF No. 9, pp. 19-20).

The Appeals Council denied the Plaintiff's request for review on June 5, 2017. (ECF No. 9, pp. 5-10). Subsequently, Plaintiff filed this action. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the case is now ready for decision. (ECF Nos. 11, 12).

## II. Relevant Evidence

The undersigned has conducted a thorough review of the entire record in this case. Because the Plaintiff's appeal concerns the limitations resulting from her seizure disorder, the undersigned will only recount the evidence relevant to her claim.

In February 2013, neurologist, Dr. John Kareus, noted Plaintiff had been seizure free since beginning Vimpat and Keppra XR, but continued to experience occasional spells wherein

2

her left arm and leg draw up when she was under stress. (ECF No. 9, p. 415). The greater the stress, the more intense her symptoms. Plaintiff did report that Cyclobenzaprine helped with these symptoms. An examination revealed a good mental status with no cranial nerve abnormalities, focal motor deficits, or gait disturbance. Dr. Kareus did not believe her symptoms were true seizure-like phenomena, and concluded that she was doing well, overall, on her medications. He diagnosed controlled seizure disorder, essential tremor, and intermittent spasm of the left arm and left leg, probably related to stress and anxiety. Dr. Kareus also continued her medications unchanged with follow-up as needed.

In May 2013, Plaintiff reported no seizures. (ECF No. 9, p. 414). She was still experiencing some muscle spasms and drawing, as previously described, but taking extra Flexeril seemed to relieve them. Plaintiff indicated she could go for a month without experiencing muscle spasms, but then her arm and hand would draw up and remain in this condition for weeks. She also reported a new problem, foot drop on the left side. There was no pain or known injury associated with this symptom. However, it was noted to be fairly significant, causing her to walk with a high stepping gait. An examination revealed considerable weakness with 4-/5 dorsiflexion of her left foot, an inability to lift her toes up, numbness over the lateral aspect of her foot and lateral leg on the left side, absent reflexes at the ankles bilaterally, and slight tenderness over the fibular head or peroneal nerve at the fibular head. Dr. Kareus concluded that her examination and numbness suggested the possibility of a lumbar problem. Accordingly, he ordered an electromyography and nerve conduction studies, and advised her to continue her seizure medication unchanged.

On February 11, 2014, Plaintiff presented for an annual exam with Dr. John Lane. (ECF No. 9, pp. 459-462). She reported experiencing some occasional partial seizures while at work; however, this was not problematic for her, as her workplace was supportive. Vascular, abdominal, cardiovascular, extremity, and respiratory exams were all unremarkable. Dr. Lane advised her to continue following up with neurology.

On February 22, 2014, Plaintiff sought out emergency treatment for focal seizures. (ECF No. 9, pp. 463-471). She reported multiple episodes of her arm drawing up and remaining in that position.[1] Plaintiff indicated that Dr. Kareus was treating her for these spells. An exam revealed full orientation with no evidence of seizure activity or behavioral abnormalities, no cranial deficits, a normal mood and affect, and normal thought content, muscle tone, and coordination. On consultation, Dr. Kareus recommended that she increase her Vimpat dosage.

On March 5, 2014, Plaintiff returned for a follow-up with Dr. Kareus. (ECF No. 9, p. 413). She continued to experience abrupt episodes in which her left hand draws up at the elbow, her left wrist flexes, her hand clinches, and her left leg draws up to her hip. Plaintiff reported occasional speech difficulties due to the tightening of the muscles in her neck. According to the Plaintiff, these spells typically lasted up to one minute, and she could experience several spells in a row. Other times, she may go for extended periods without experiencing a spell. On examination, Plaintiff was free of any focal deficits and the doctor could not induce one of her spells with movement. Her mental status was normal with no cranial nerve abnormalities or gait deficits. Believing her spells might represent simple motor

---

[1] She reported more than 10 episodes in a 12-hour period.

4

seizures, Dr. Kareus ordered follow-up EEG and MRI scans and advised her to continue her medications as prescribed.

On March 12, 2014, results of an electroencephalogram ("EEG") suggested the possibility of a focal seizure disorder originating in the left temporal region. (ECF No. 9, p. 416).

On April 30, 2014, at the agency's request, Dr. Almad Al-Khatib conducted a neurological evaluation of the Plaintiff. (ECF No. 9, pp. 418-419). Despite taking her anti-seizure medications as prescribed, Plaintiff reported intermittent episodes of left upper and lower extremity stiffness and posturing, but no alteration of awareness. She recounted approximately one episode per week with her last episode occurring one week prior to her appointment. On examination, the Plaintiff was alert and fully oriented with a normal mental status and intact speech and language. She exhibited normal motor strength throughout with no evidence of drift or orbiting, intact deep tendon reflexes, down going plantar responses bilaterally, intact sensation, intact coordination, and a normal gait with no difficulties performing any of the tasks requested.[2] Dr. Al-Khatib diagnosed poorly controlled partial seizures with secondary generalization. He recommended seizure precautions to include no driving, operation of heavy or dangerous machinery, work near heights, or swimming. He opined she had no definite sitting, standing, walking, carrying or handling restrictions.

On May 30, 2014, non-examining consultant, Dr. Ronald Davis, reviewed Plaintiff's medical records and concluded she could perform light work with no exposure to hazards such

---

[2] Plaintiff was asked to walk on her toes, heels, and a perform tandem walk.

5

as machinery and heights. (ECF No. 9, pp. 97-100). He also indicated she should not drive an automobile.

On July 30, 2014, Plaintiff reported continued spells of left arm and leg drawing. (ECF No. 9, p. 426). The week prior, she had experienced recurrent episodes over the course of 45 minutes. Dr. Kareus indicated that it was very difficult to delineate whether this represented seizure activity. Her EEG had shown some sharp wave discharges that appeared over the left hemisphere rather than the right. An MRI showed some white matter lesions in the right frontoparietal white matter, which could be associated with these events, but no other abnormalities were detected. Dr. Kareus stated he could not absolutely conclude that these episodes represented seizures, as she was having no generalized convulsions. Accordingly, he opted to increase her Vimpat dosage.

On August 7, 2014, Plaintiff returned for a follow-up with Dr. Kareus. (ECF No. 9, p. 425). She reported recent spells wherein she experienced the spontaneous drawing up of her hand to her face. Upon review of a recording of one of Plaintiff's spells, Dr. Kareus stated that she remained in that position for several seconds before the muscles relaxed and returned to a normal position. He also noted that her leg turned in during the spell. Dr. Kareus was concerned, however, that her abnormal EEG results in March, showing discharges in the left hemisphere, were inconsistent with her left side symptoms. Noting that she had not experienced a grand mal seizure in two years, Dr. Kareus concluded that her episodes could be the result of a dystonic movement disorder. For this, he prescribed a trial of the medication Sinemet. In the meantime, he advised her to continue her anti-seizure medications, again increasing her Vimpat dosage.

6

On August 13, 2014, Dr. Kareus completed a treating physician's report for seizure disorders. (ECF No. 9, pp. 427-428). He described two types of episodes: 1) generalized convulsions, and 2) spells of left arm and leg posturing. Dr. Kareus reported that her last seizure occurred two years prior, but she had experienced an episode of abnormal posturing on August 7, 2014. He indicated that she took both Vimpat and Keppra XR, and had done so for a lengthy period. Further, he stated that an EEG in March 2014 showed left temporal discharges.

On August 26, 2014, Plaintiff was treated for rib and leg pain associated with an increase in seizure activity. (ECF No. 9, pp. 452-455). An examination revealed musculoskeletal tenderness and lesions on the left leg, but was otherwise unremarkable. Dr. Gibbons diagnosed seizure disorder, knee pain, and obesity and prescribed Meloxicam. He also advised her to begin low impact exercise and stretching, gradually increase her exercise to one hour per day, and watch her diet.

On October 10, 2014, Dr. Steven Strode reviewed Plaintiff's medical records and concurred with Dr. Davis. (ECF No. 9, pp. 122-125).

On February 5, 2015, Plaintiff indicated she had experienced two seizures the previous day and two the prior week. (ECF No. 9, pp. 441-448). Following an unremarkable exam, Dr. Gibbons referred to her Dr. Kareus.

On February 23, 2015, EMS was dispatched to Plaintiff's residence due to alleged seizure activity. (ECF No. 9, pp. 430-433). On arrival, she was alert and oriented, but complained of twitching in her left arm. No life threats were noted, and the Plaintiff denied any other seizure activity. She stated that these spells had become more frequent over the last

few weeks. EMS staff advised her to seek care through her physician during regular office hours.

On May 8, 2015, Plaintiff established care with Dr. Steve-Felix Belinga. (ECF No. 9, pp. 472-476). She reported a 10-year history of seizure-like spells with her last seizure occurring in March. Although the Plaintiff indicated she had not experienced a grand mal seizure in the last five years, she now reported some occasional loss of consciousness, disorientation, falling, and stiffness with her episodes. Additionally, as an aura to her seizures, she reported experiencing tunnel vision. When asked about stress, Plaintiff admitted having trouble with her older daughter and experiencing a "traumatic divorce," but denied any direct link between her spells and stress. On exam, she exhibited a normal cranial nerve exam, normal motor tone and bulk, intact sensation, normal reflexes, normal coordination, and a narrow based gait with no limitations. Additionally, she was alert and fully oriented with intact comprehension and speech. Dr. Belinga diagnosed fairly well controlled seizures and ordered an EEG. Additionally, he increased her Vimpat dosage.

From July 2015 through May 2016, Plaintiff sought out treatment for bilateral knee pain. (ECF No. 9, pp. 478-499, 511-831). X-rays of her knees showed some mild degeneration, resulting in a diagnosis of inflammatory arthralgia. Orthopedist, Dr. James Long, prescribed a nonsurgical treatment regimen to include steroid injections in both knees, a Decadron Dose pack, anti-inflammatory medication, and strengthening and stretching exercises.

### III. Applicable Law

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

9

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work ("PRW"); and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity ("RFC"). *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## IV. Discussion

Plaintiff essentially raises two issues on appeal: whether substantial evidence supports the ALJ's RFC determination and whether she can perform her PRW. After reviewing the record, the undersigned finds that the ALJ's decision to deny benefits is supported by substantial evidence.

### A. RFC Determination

In her first issue, Plaintiff contends that the ALJ's RFC determination is flawed because it does not account for all of the limitations associated with her seizure disorder. RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545, 416.945. A disability claimant has the burden of establishing his or her RFC. *Vossen,* 612 F. 3d at 1016.

"The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

The medical evidence before the Court does not support Plaintiff's allegations concerning the frequency or severity of her alleged seizures. Contrary to her assertion, the record reveals that she does not experience true convulsive seizures. In 2015, she told Dr. Belinga that she had not experienced a grand mal seizure in over five years. And, her neurologist, Dr. Kareus, indicated he could not absolutely conclude that her spells represented seizures. (ECF No. 9, p. 426). Instead, Plaintiff suffers from what Dr. Kareus termed "spells of left arm and leg posturing" or "spontaneous motor spells." (ECF No. 9, pp. 427-428). During these episodes, her left arm and leg stiffen and draw up, but she experiences no loss of consciousness or awareness. (ECF No. 9, pp. 418-419).

An EEG conducted in March 2014 revealed findings suggestive of a focal seizure disorder originating in the left temporal region, but such findings were not consistent with her

11

complaints of left side symptomology.[3] (ECF No. 9, p. 416). An MRI of her brain showed some white matter lesions in the right frontoparietal white matter, which could be associated with these events, but no other abnormalities were detected. (ECF No. 9, p. 426). Plaintiff was initially treated via the anti-seizure medications Vimpat and Keppra, as well as a muscle relaxer. (ECF No. 9, pp. 427-428). Due to a possible connection between Plaintiff's stress level and her seizures, Plaintiff was also prescribed Cymbalta. Moreover, in August 2014, Dr. Kareus added Sinemet to see if perhaps her symptoms were the result of dopamine responsive dystonia ("DRD").[4]

Physical examinations conducted throughout the relevant time period consistently revealed normal cranial nerves, motor tone and bulk, reflexes, coordination, and ambulation; intact sensation; a normal mood and affect; full orientation with good insight; and, intact comprehension and speech. Further, a consultative neurological evaluation conducted by Dr. Al-Khatib in April 2014, resulted in a diagnosis of poorly controlled partial seizures with secondary generalization. (ECF No. 9, pp. 418-419). Dr. Al-Khatib recommended seizure precautions, to include the avoidance of heavy or dangerous machinery, driving, working near heights, and swimming. He found the Plaintiff to have no definite sitting, standing, walking, carrying or handling restrictions. Additionally, in May 2014 and October 2014, respectively, non-examining consultants, Drs. Ronald Davis and Steven Strode, reviewed Plaintiff's medical

---

[3] The left side of the brain is said to control the right side of the body and vice versa.
[4] DRD is a hereditary form of dystonia (persistent or intermittent muscle contractions or movements often resembling a tremor) characterized by progressive difficulty walking. Dystonia Medical Research Foundation, *Depo-Responsive Dystonia*, *at* https://www.dystonia-foundation.org/what-is-dystonia/forms-of-dystonia/dopa-responsive-dystonia/more-on-dopa-responsive-dystonia (last accessed May 23, 2018).

records and concluded she could perform light work, but would require the same seizure precautions assessed by Dr. Al-Khatib. (ECF No. 9, pp. 97-11, 122-125).

In May 2015, Dr. Belinga examined the Plaintiff and characterized her seizure condition as "fairly well controlled." (ECF No. 9, pp. 472-476). Moreover, his examination of the Plaintiff also demonstrated no cranial nerve, motor tone and bulk, reflexive, or gait related deficits; intact sensation; and, full orientation with no speech or comprehension deficiencies. He did adjust her Vimpat dosage, but made no notations to suggest that Plaintiff's seizures resulted in limitations beyond the seizure precautions assessed by the previous examining and non-examining consultants. Thus, it does not appear that Plaintiff's seizure disorder resulted in additional limitations beyond the seizure precautions found by the ALJ.

The record also fails to support Plaintiff's assertion that she was hospitalized in 2015 due to seizures. In February 2015, EMS was summoned to her residence for alleged seizure activity. (ECF No. 9, pp. 430-433). Upon arrival Plaintiff was alert and oriented, and she complained of only twitching in her left arm. Plaintiff denied any other seizure activity, and EMS staff advised her to contact her physician. Because her condition was neither emergent nor life threatening, they did not transport her to the hospital. Plaintiff's subjective reports concerning her ability to perform activities of daily living also fail to support her contention of disability. In March 2014, she was working as a cashier and reported the following activities: preparing her mother's meals, helping her mother walk, caring for her own personal hygiene without limitation, preparing simple meals, cleaning house, doing the laundry, mowing the lawn, going outside daily, walking, driving, going out alone, shopping in stores for groceries once per week for one hour, handling her finances, reading, watching television, and going out

to eat once per week. (ECF No. 9, pp. 328-332). Although she later told Dr. Belinga that her spells were not stress related, she previously indicated to others that stress precipitated her seizures. Additionally, in July 2014, Plaintiff reported an inability to work due to her seizures, stating that these spells "stop the work process," despite reporting five months earlier that her seizures posed no threat to her employment. (ECF No. 9, p. 360-366, 459-462). Further, she now admitted to helping her mother care for her granddaughter part of the day, in addition to the same activities recited in March.

The frequency of Plaintiff's seizures and the length of her incapacitation following an episode are also contradicted by the record. In support of her case, Plaintiff presented her own testimony, as well as the testimony of and seizure statements prepared by her mother and close friend, James Benefield. At the first administrative hearing, Plaintiff testified she had experienced one to two seizures over the previous month, and she indicated it took her 24 hours to recover from a spell. (ECF No. 9, pp. 72-73). In contrast, her mother testified that although the number of seizures varied, she had not experienced a seizure in a month. (ECF No. 9, pp. 78-79). Plaintiff's mother also indicated that Plaintiff's recovery period was approximately 30 minutes. (ECF No. 9, pp. 81-82). At the supplemental hearing, Plaintiff's testimony changed. She was now averaging two to three seizures per month, and two to three days were required to recover from each spell (ECF No. 9, pp. 44, 53); however, Plaintiff's friend, James Benefield, testified that he interacted with Plaintiff on a daily basis, and she had not experienced a seizure in three months. (ECF No. 9, pp. 55). Further, he stated that it took her approximately one hour following a seizure to return to normal. (ECF No. 9, pp. 56-57).

Plaintiff's description of her recovery period changed again in July 2014, when she stated that it took her two to three hours to recover from a seizure. (ECF No. 9, pp. 360-366). And, in March 2016, she submitted an apparent seizure log indicating she had experienced three spells in July 2015, seven in September 2015, two in October 2015, three in November 2015, four in December 2015, seven in January 2016, 12 in February 2016, and two in March 2016. (ECF No. 9, p. 402). Interestingly, however, despite reviewing a recording of her spells, Dr. Kareus made no notations that these spells involved any loss of consciousness, disorientation, or falling, or that they required a significant recovery period.

Accordingly, the Court concludes that the ALJ was well within his purview to discredit the testimony and written statements of the Plaintiff and her witnesses, as they are not supported by the overall record.

### B. Step Four Determination

The Plaintiff also argues that the ALJ ignored the vocational expert's ("VE") testimony that she could not return to her PRW if she were to experience seizures at work. We note, however, that vocational expert testimony is not required at step four of the analysis. *See Hill v. Colvin,* 753 F.3d 798, 801 (8th Cir. 2014) (vocational expert testimony not required at step four where the claimant retains burden of proving he or she cannot perform prior work). Nevertheless, we find the expert's affirmative testimony supports the ALJ's determination the Plaintiff could return to her PRW. The VE testified that an individual of Plaintiff's age, education, work history, and with the same RFC as described in the ALJ's decision, could return to her PRW as a records clerk, cashier-checker, and receptionist. As previously noted, the RFC determined by the ALJ included traditional seizure precautions.

The VE did testify that an individual suffering absenteeism due to unpredictable seizure activity, in excess of three absences per month, or requiring frequent and unscheduled rest periods would be unable to perform any competitive employment; but, as previously determined, the record does not support a finding that the Plaintiff's seizure disorder would result in any additional limitations beyond the seizure limitations imposed by the ALJ.

Accordingly, the undersigned finds that the ALJ's Step Four determination is supported by substantial evidence.

## IV. Conclusion

Based on the foregoing, I recommend affirming the ALJ's decision and dismissing the Plaintiff's Complaint with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 25th day of May, 2018.

/s/ Mark E. Ford
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE